THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* FRANK A. ERICKSON, Defendant.

City Magistrates' Court of New York, Borough of Queens, First District, June 22, 1939.

*Charles P. Sullivan, District Attorney [J. Irwin Shapiro of counsel],* for the plaintiff.

*Littleton & Levy [Martin W. Littleton and Richard H. Brown of counsel],* for the defendant.

COOPER, C. M. The defendant comes before the court on an information charging him (Code Crim. Proc. § 899, subd. 5) with being a disorderly person in that he falls within that class of " Persons who have no visible profession or calling, by which to maintain themselves, but who do so, for the most part, by gaming." This statute was enacted more than one hundred and ten years ago and, while invoked on occasion, its application in written opinion, diligent search discloses, has never been treated by the courts of this State.

In the course of an investigation conducted by the commissioner of investigation of the city of New York, pursuant to the powers vested in him by the city charter, the defendant in April, 1939, voluntarily appeared as a witness therein and after being sworn gave testimony in the presence of his attorney. Slaient portions of his testimony given on that occasion were made a part of the entire record before me. Factual references made in this opinion, it must be understood, are entirely from the stenographic minutes in the case before me.

He was asked: " Q. What is your business or occupation, Mr. Erickson? A. I am a commission broker. Q. In what particular line? A. Specialize in horse racing bets. Q. How long have you been in that business or occupation? A. I have been in that business 20 years. * * * Q. Will you describe, in your own words, without my asking you a series of detailed questions, just what your business consists of; what the activities of that business include? In other words, a description of your business. A. Well, I take bets on race horses. Q. Is that all? A. That's all. Q. Do you accept bets on sporting events? A. Yes, yes. Q. What kind of sporting events? A. Fights, football. Q. Any other events? A. World series in baseball. Q. Well, will you describe just how you operate? A. I told you, I take bets on fights, baseball, world series baseball, horse races. * * * Q. Now, by ' business ' we understand each other, you are referring to placing bets on horses? A. That's right. Q. Is that the great bulk of your business? A. Yes, horses. Q. Would you say that 90 to 95 per cent. of your business is betting on horses? A. That's right." In addition to the instances above set forth, the record is replete with admissions by the defendant that he is a professional bookmaker. In fact, it was conceded upon the hearing.

In another part of his testimony he amplified this somewhat: " A. I am a bookie. Now, a man that would book other bets and give bets to me where he would get a percentage, I would call him an agent. Q. An agent? A. That is what I would call him. You see, I am a bookmaker, you understand, and if another man took bets and gave them to me I would call him an agent. Q. Do you pay anybody commission in New York City? A. I pay some people commission. I wouldn't know whether they are in New York or not."

The defendant's extensive gambling activities have by no means been limited to the taking of bets at race tracks. The entire record conclusively shows that the major portion of his betting took place elsewhere in the city of New York. He maintains a " wire room " in New Jersey with at least twelve telephones installed therein, each bearing a New York exchange number. In addition to his gaming activities within this city he admitted conducting a " wire " business " outside the city limits." Bets taken by him originated at points throughout the country. He has also been engaged in the financial operation of dice and roulette games at a club located in Hollywood, Fla.

In addition to the New Jersey office the defendant has maintained a four-room suite of offices at No. 1480 Broadway, in the borough of Manhattan. He has occupied the New York offices for twelve years last past, but claims to have discontinued them recently. He maintained there four unlisted telephones for eight years, and took many of the calls himself. He denies, however, that any bets were taken over these telephones.

Of significance is his admission that he kept records of the identity and credit ratings of his customers in the New York offices. These records were used to guide his decision as to the acceptance of particular bets.

" Q. Do you keep any records at all? A. I keep the records, yes. Q. Personally? A. Yes. * * * Q. What kind of records are they? Can you describe it in other words without being technical? A. I make a pay off sheet, one side pay and the other side collected and every day I pay — I pay the next day — or I just put a ring around that as the other comes in, as the other collections come in I put the ring around it as it is paid. * * * Q. And how far back do your present records go to the best of your recollection? A. Three years. Q. And those records are in your office in New York, is that right? A. That is right."

He has kept an extensive index system.

" Q. A card index? A. Yes, yes. Q. Where is that card index? A. Where is that card index? It is in that New York office.

* * * Q. And would you say that all of these cards to the best of your knowledge have a proper credit notation? A. Yes. * * * Now, I will explain. I am just explaining my system. Now, there would be a newsboy — I am just using ' newsboy ' as a name — could bet me a thousand dollars and he might have no money at all and I know his credit is good and never have any index card, and I know his credit is good and I never charge it. There might be a business man or might be anybody else. His credit is $200. His credit might change every day. Every day of course he is on there for $200."

To assist him in the operation of his New York offices defendant employed two men.

" Q. What were the duties that you assigned to those two employees? A. Steve was the cashier — Steve is the cashier and Leonard is in charge of the office. Q. As cashier what does Steve Morrow do? A. He makes the deposits in the bank and sends the checks. Q. What checks? A. Sends checks to any customers we have business with. Q. Do you receive money there? A. No. Q. Where do you receive the money. A. Receive the money? Q. Yes. A. Well, our business is all a check business. We receive our mail there. Let's use that. Q. You receive mail there? A. Yes. Q. Do you receive any money there? A. Money there? Well, on occasions, yes. Q. Only on occasions or regularly? A. It is not — if a man don't pay you in cash he may come up there and pay you. I mean it is not regular — it is on occasions. That is the way to put it. It is not — in other words it — the — 98 per cent. of the business is done by check."

Not only has the defendant received many bets directly, but he has operated extensively through " agents." He admits having as many as ten or twelve " agents," depending on the volume of business on any particular day. He professed ignorance as to the locale of the activities of many of the " agents " to whom he paid commissions. From all the testimony the New York offices may be described as the " collect and pay off " headquarters maintained by the defendant.

Only one witness was called on behalf of the defense. An accountant connected with a brokerage house testified that the defendant opened an account there in February, 1937, with $50,000 cash and that he bought securities on margin and had an equity in the account as of May 6, 1939, of approximately $197,500. Neither the activity of this account was shown nor the nature or source of the property of which it was constituted. In addition, defendant introduced into evidence shares of bank stock held in his name having a current value of approximately $120,000. No

proof whatever was even offered by him at least to indicate the engagement by him in any vocation other than that established by the prosecution. His entire defense consisted of a show of wealth possessed by him. In fact, his counsel declared that he would be unable to show the source thereof.

Such is the state of the record. When all these facts are looked at even with a most indulgent eye, it is impossible for any man to arrive at any conclusion other than that the defendant presently and for many years last past has devoted his waking hours exclusively to excessive and continuous gaming and throughout has maintained himself thereby not alone " for the most part," but entirely so. All this is established beyond any reasonable doubt by the defendant's own sworn testimony and the normal and reasonable deductions to be gathered therefrom.

The defendant vigorously takes the position that the subdivision upon which the information is based concerns itself primarily with the defendant's financial ability to maintain himself, and since there is proof positive that he possesses ample means to effectuate that end, and hence will not be a public charge, the statute is satisfied and the information must fall. In his brief, counsel for defendant nowhere attempts to refer to testimony or advance argument that defendant has any calling or profession other than the vocation of gambling so clearly established by the defendant himself. He contents himself merely with the position that " the proferred proof is that he has some $250,000 whereby his maintenance is secured " (p. 2) and " Nor is it any ground for objection to the admission of the evidence that it is not shown how the property was accumulated " (p. 9). Such a contention does not place the emphasis on the real prohibition involved — vocational gambling. For a long time such practices have been the subject of judicial condemnation and legislative fiat. At common law no game was in itself unlawful. (11 Co. Rep. 87; *Sherbon* v. *Colebach*, 2 Vent. 175.) And for a long time, even after legislative enactments addressed to the subject of gaming appeared, the occasional indulgence in certain games was not declared within the prohibition. (*Reg.* v. *Ashton*, 1 E. & B. 286, decided 1852.)

A few years before the enactment involved here was placed upon the statute books of this State, a case arose in England (*The King* v. *Rogier*, 2 D. & R. 431, decided 1823) wherein the judges ruled (p. 435) that " Any practice which has a tendency to injure the public morals, is a common law offense. * * * No game is unlawful in itself, but every game may be rendered so by playing at it for an excessive stake; for it is the amount played for, and not the name or nature of the game, which is the essence of it, and which constitutes an offense in the eye of the law."

An ancient (1664) English statute (16 Car. II, c. 7) affords us an opportunity to see that for a long time the condemnation of excessive gaming for stakes with all its attendant consequences has been the subject of legislative concern. It provided: " An Act against deceitful, disorderly, and excessive gaming." It begins by reciting that " all lawful games and exercises should not be otherwise used, than as innocent and moderate recreations, and not as constant trades or callings to gain a living, or make unlawful advantage thereby." It further admonished that " by the immoderate use of them many mischiefs and inconveniences do arise " and among them " the encouragement of sundry idle, and loose and disorderly persons * * * and the debauching of many of the younger sort both of the nobility and gentry, and others, to the loss of their precious time, the ruin of their estates and fortunes, and the withdrawing them from noble and laudable employment." And certainly the eminent Mr. Blackstone is in full accord (Vol. 4, p. *171): " Next to that of luxury, naturally follows the offense of gaming, which is generally introduced to supply or retrieve the expenses occasioned by the former: it being a kind of tacit confession, that the company engaged therein do, in general, exceed the bounds of their respective fortunes; and therefore they cast lots to determine upon whom the ruin shall at present fall, that the rest may be saved a little longer. But, taken in any light, it is an offense of a most alarming nature: tending by necessary consequence to promote public idleness, theft, and debauchery among those of a lower class; and, among persons of a superior rank, it hath frequently been attended with the sudden ruin and desolation of ancient and opulent families, an abandoned prostitution of every principle of honor and virtue, and too often hath ended in self-murder. * * * it is the gaming in high life, that demands the attention of the magistrate; a passion to which every valuable consideration is made a sacrifice."

Similar expressions of disapproval are to be found. For example: " promote cheating and other corrupt practices, and incite to idleness and avaricious ways of gaining property great numbers whose time might otherwise be employed for the good of the community." (1 Russell on Crimes, p. 428.) An excellent treatise on this subject-matter is to be found in the decision of Mr. Justice HAWKINS in *Jenks* v. *Turpin* (L. R. [1884] 13 Q. B. Div. 505), cited with approval in *Dalton* v. *Adelphi Club* (4 All England Reports [1938], 556).

Many decisions in our own courts are to be found declaring certain general practices — not merely particular acts — engaged in, or a general course of behavior pursued by, or a mode of life or habits and practices indulged in, by certain persons as prejudicial

to the public welfare, and the proper subject of suppression. Such practices have been declared inimical to the safety and well-being of society, demoralizing, and likely to weaken or corrupt public morals. (*Morgan* v. *Nolte*, 37 Ohio St. 23; *Matter of McCue*, 7 Cal. App. 765; 96 P. 110.)

With this in mind we may approach the legislative intent with which the subdivision under review was promulgated by examining the eight other subdivisions of the same section. Thus it clearly may be seen that the prohibition is aimed at a course of behavior disadvantageous to society, the violation of which makes one a disorderly person: the abandonment or threat to abandon wife or child; the keeping of bawdy houses or houses for the resort of prostitutes, gamesters or habitual criminals; performances by mountebanks; the keeping upon the public highway of an apparatus for gaming, etc. And it would be idle to argue that where proof sustains the commission of the offense, a show of wealth, without more, would place one outside the category of disorderly persons.

From all that appears, then, the objective sought to be accomplished by the Legislature in this enactment was the suppression of excessive gaming. Accordingly, the defendant's contention that mere possession of wealth by him exempts him from the provisions of the statute is not even specious, for it would be tantamount to upholding legislative approbation for the successful gambler and condemnation of those upon whom the goddess of chance has frowned. Even under the provisions relating to vagrants (Code Crim. Proc. § 887), where the failure to have " visible means " of support is an important element requiring consideration, the mere possession of money by a defendant, without further explanation, cannot be regarded as proof positive that the defendant had " visible means " whereby to support himself. The " means " must be " legitimate and sufficient, the result of industry and honest effort and toil, or otherwise lawfully acquired. They are the ' means ' which honest men usually possess and employ, and not those of tricksters, fakirs, thieves and other violators of our laws." (*People* v. *Cramer*, 139 Misc. 545.)

I venture the suggestion that the words " by which to maintain themselves " as employed in the statute, when considered in the light of the time of its enactment, has nothing to do with financial return, but refer to constant, uninterrupted and excessive gaming indulged in during the waking hours normally spent by those intent on maintaining themselves in some peaceable or legitimate vocation, no matter how humble it may be. Thus the emphasis is placed on gaming as a vocation, not as an avocation.

The defendant argues that the prosecutor has failed to show either that he actually maintains himself by gaming or that such

practices were indulged in to the exclusion of any other enterprise. Not only do the admissions of the defendant establish overwhelmingly that he has maintained himself throughout the years entirely by these practices, but as well that he has been very successful at them. The irresistible deduction to be drawn from his show of wealth is that it came directly from these excessive practices. If in the light of such conclusive testimony any other calling or profession could possibly have existed, the defendant completely failed to show it. The courts have long held that where the People's evidence is strongly suggestive of guilt and the defendant apparently has it in his power to produce proof in support of any explanation that may exist, his failure so to do tends materially to strengthen and confirm the sworn evidence introduced by the prosecution. (*People ex rel. Woronoff* v. *Mallon*, 222 N. Y. 456, 465; *Graves* v. *United States*, 150 U. S. 118, 120; *People* v. *Grimshaw*, 33 Hun, 505, 510; 4 Wigmore, Evidence [2d ed.], pp. 903–906; Greenleaf on Evidence [16th ed.], § 79.) In the premises, I feel warranted in construing the facts and circumstances adduced before me, which, if innocent, the defendant might have controverted or explained, most strongly against him. (*People* v. *Trombino*, 238 App. Div. 61, 65; affd., 262 N. Y. 689; *People* v. *Smith*, 114 App. Div. 513, 517.)

Because the People's case rests on testimony elicited solely from the mouth of the defendant, he declares that a conviction cannot be had without contravening the safeguards guaranteed by section 395 of the Code of Criminal Procedure, which among other things makes imperative some testimony additional to the confession of a defendant. First, that section refers specifically to crimes and not to an offense, with which latter we are dealing here. Second, the disorderly conduct statute distinctly provides (Code Crim. Proc. § 901) that a confession, unsupported by anything else, is sufficient to warrant a finding that the confessor is a disorderly person. Certainly the sworn testimony of the defendant in this case is tantamount thereto.

In his brief, counsel for the defendant contends that "gaming" as used in the statute under consideration does not cover the gambling activities of the defendant as disclosed by the record. Pleading that the decisions of this State are barren of any direct authority on the subject, he takes recourse in quoting from the statutes and decisions of other lands. Webster's New International Dictionary (1930) is an excellent authority to start with:

"gaming — act or practice of playing games for stakes or wagers; gambling. See gambling."

"gambling —* * * a. Properly, the act of playing or gaming for stakes. b. Loosely, the act of risking or staking anything on an uncertain event; wagering. In the strict sense of the term,

gambling implies a playing or gaming, as at checkers, dice, cards, horse racing, cockfighting, or some other sport or contest, as well as a staking or risking of money to be lost or won on the issue."

The judges of our own State have often held " gaming " and " gambling " as synonymous. (*Clement* v. *Belanger*, 120 App. Div. 662; *People* v. *Cohen*, 160 Misc. 10; *People* v. *Fuerst*, 13 id. 304.) And in *Chapin* v. *Austin* (165 Misc. 414) it was said (p. 416): " Hence, bookmaking at the race track is gaming or gambling, and is illegal."

The statute that we deal with here has nothing to do with punishment for past offenses, and the existence of other penal statutes which may also be invoked will not stay the enforcement of the course prescribed for dealing with disorderly persons. The two proceedings have different ends in view, one dealing with punishment to be meted out the felon or misdemeanant, and the other to restrain, discourage and prevent a continuation of the practices condemned by the offense. (*People ex rel. Van Houton* v. *Sadler*, 97 N. Y. 146; *People ex rel. Sievers* v. *McGee*, 166 Misc. 379.) To the latter end security may be compelled of the disorderly person for his good behavior, the putting up of which in the amount fixed by the court prohibits the imposition of any jail commitment. (Code Crim. Proc. § 901 *et seq.*)

Throughout, defendant's counsel persists in referring to the statute invoked here as antiquated, mildewed and antithetical to the march of progress. With the wisdom of this long-standing enactment (see The Law Journal, London, on " Unlawful Gaming," appearing in the New York Law Journal June 17, 1939, p. 2806), I may exercise no concern. I content myself in quoting from the concluding remarks of Mr. Justice HAWKINS (p. 527), whose authoritative exposition (in *Jenks* v. *Turpin*, *supra*, decided 1884) on the law relating to certain phases of this subject has been adopted by the Lord Justices of the King's Bench Division of England (*Dalton* v. *Adelphi Club*, *supra*), that " We do but administer the law as we believe it to be and to have existed for many a long year, though it has been so often broken and disregarded with impunity that at last its existence seems to have been forgotten; and, quoting the language of Blackstone (Vol. 4, p. 173), I say ' Our laws against gaming are not so deficient as ourselves and our magistrates in putting those laws into execution.' "

I am satisfied that the defendant is a disorderly person within the terms of this statute, and, pursuant to law (Code Crim. Proc. § 901, subd. 2), I require that he give security, by a written undertaking, with a surety approved by me, in the sum of $10,000 to the effect that the defendant will be of good behavior for the space of one year.